IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 17, 2019

## STATE OF TENNESSEE v. JOSEPH WAYNE WETHINGTON

**Appeal from the Circuit Court for Grainger County**
**No. 5945    James L. Gass, Judge**

---

### No. E2018-02140-CCA-R3-CD

---

The defendant, Joseph Wayne Wethington, appeals his Grainger County Circuit Court jury convictions of attempted rape of a child, arguing that the evidence was insufficient to support his conviction, that the trial court admitted certain testimony in violation of Tennessee Rule of Evidence 404(b), and that his sentence was excessive.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and Alan E. Glenn, JJ., joined.

Robert M. Burts, Rutledge, Tennessee, for appellant, Joseph Wayne Wethington.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and George C. Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Grainger County Grand Jury charged the defendant by presentment with four counts of rape of a child and four counts of aggravated sexual battery for offenses committed against his niece, J.T.[1]  The State dismissed six of the counts prior to trial and proceeded to trial on two counts of rape of a child.

At the May 2018 jury trial, the victim's mother, who was married to the

---

[1]    As is the policy of this court, we will refer to the minor victim and all other minors by their initials.  In a further effort to protect the anonymity of the minor victim and her siblings, we will refer to their relatives by their initials.

defendant's brother, J.W., had two children, including J.T., who was born on October 30, 2005, and was 12-years old at the time of trial. J.W. had two sons, and the blended family lived in Virginia. J.W.'s parents, T.W. and R.W., his sister and brother-in-law, V.W. and R.B., and the defendant, whom the victim called "Joe-Joe," lived in Tennessee. The victim's mother testified that she and J.W. took the children to visit his family for holidays and that the children would visit during summer vacation, spending time at both V.W. and R.B.'s house and T.W. and R.W.'s house. During these visits, the defendant was living with V.W. and R.B. The victim's mother stated that J.W. had a good relationship with his family but did not have a good relationship with the defendant. The children enjoyed spending time with the family and never indicated to her that they did not want to visit.

The victim's mother recalled that, sometime prior to Thanksgiving 2016, she "found a letter where [the victim] had asked her brother. . . who he wanted to have sex with." When she notified the police about the letter, social services removed the victim from the family home and placed her with her maternal grandfather for approximately two weeks. During that time, the victim would come to the family home "throughout the day to do her homeschooling and return to my father's house when the boys would come home." After the two-week period, the victim "was allowed to come home," but she "had to be supervised at all times." Less than a month after discovering the victim's letter and shortly before Thanksgiving, the victim told her mother that the defendant "touched me inappropriately," and "she moved her hands in the region" of "her vagina area." The victim's mother contacted law enforcement in Grainger County, and in December 2016, she took the victim to meet with a forensic interviewer in Sevierville.

During cross-examination, the victim's mother acknowledged that the victim had been caught with images on her computer that were "maybe sexually explicit for her age." She clarified that she showed the victim's letter to law enforcement officers, but they did not take the letter, and she assumed that it had been thrown away because she no longer had it. The victim's mother said that she did not "know the background" of J.W.'s contentious relationship with the defendant and knew only that they had not had a good relationship for some time. Although she denied having an "issue" with her mother and father-in-law, she acknowledged that she did not always enjoy visiting her husband's family. The victim's mother stated that the victim did not mention the defendant's abusing her until late 2016, and she reiterated that the victim had never expressed any reservation about visiting J.W.'s family other than asking "where she would be sleeping." She explained that when the children visited during the summers, she and J.W. would not stay with them.

On redirect examination, the victim's mother stated that the victim had not

been charged with any juvenile offense and was not facing permanent removal from the home. She said that she had contacted police officers in Virginia to report the contents of the victim's letter, and when Grainger County law enforcement officers had requested it in connection to this case, she could not locate it.

The victim testified that she enjoyed visiting J.W.'s family in Tennessee and that, on those visits, she would "run around and play," swim, have cookouts, and get haircuts. She stated that, during these visits, sometimes her parents[2] would stay with the children, and other times, they would leave the children with the family. The victim said that, at some point, she told her mother that the defendant had "done something very bad," that he had "touched me in a very inappropriate manner," and that he had "licked me and that it was also very gross." The victim did not disclose this information to anyone before telling her mother because she "didn't really want to speak of it or tell anyone," saying that she "didn't like talking about it." The victim recalled that her mother brought her to Sevierville to meet with a forensic interviewer. The jury viewed a portion of a video recording of the victim's forensic interview.[3] The victim testified that she had told the truth during her forensic interview, specifically stating that it was true that the defendant had inserted his finger into and licked her vagina. The victim stated that these incidents occurred in a "back bedroom" of V.W.'s house while one of her stepbrothers was asleep in the bed next to her. The victim said that V.W. and R.B. were asleep in another room, and she did not call out for help because she "was just scared of I didn't want to wake up. Like, I was already half awake, but I didn't want him to do anything like hurt me or something like that."

During cross-examination, the victim testified that the incidents of abuse she described occurred in a single night. She said that on that same night, before she went to bed, the defendant had pushed her into the bathroom and told her and one of her stepbrothers to pull down their pants. She then went to bed and, sometime later that night, the defendant came into the room where she and her stepbrother were sleeping, and the defendant sat on the edge of the bed and touched and licked her. She said that the defendant did not speak to her while he was abusing her. After the defendant left the room, the victim went back to sleep.

The victim said that V.W. and R.B. were sleeping in the "front room in the bedroom," and she acknowledged that, had she called out for help, someone would

---

[2]     The victim routinely used the term "parents" to refer to her mother and J.W.

[3]     Although the record indicates that only certain portions of the video were played for the jury, the record does not specify which portions were played and which portions were excluded from evidence.

"[p]robably" have heard her. She also acknowledged that she did not tell anyone about the defendant's conduct until "late in 2016." She continued to visit the family in Tennessee after the incident with the defendant, and the victim acknowledged that she did not tell her parents that she did not want to visit or that she was uncomfortable being with the defendant. In subsequent visits to V.W. and R.B.'s house, she usually slept "[i]n the front bedroom where they would sleep."

When asked about the letter she had written to her stepbrother, the victim said that she "probably" had sent it, but she could not "remember anything about that." She recalled that she got in trouble for the letter and that she had to move out of her parents' home for a time and live with her grandfather. During that period, she was not allowed to be around her siblings. The victim acknowledged that she also had gotten in trouble for having inappropriate pictures on her computer, but she said that the people in the photographs "had clothes on." She also acknowledged that she had gotten caught touching one of her stepbrothers inappropriately and that she was once again required to move out of the family home.

On redirect examination, the victim denied that she made up the allegations against the defendant because she had gotten in trouble with the Department of Children's Services ("DCS").

Jenny Stith, a forensic interviewer at Safe Harbor Child Advocacy Center, testified as an expert in forensic interviewing. In her job, she interviewed children who had been referred by DCS or by law enforcement. Ms. Stith explained that, during her interviews, she sought to invoke a victim's "free recall memory so that [she] can get as much detail about the incident of abuse." To accomplish this, she employed "a lot of 'Tell me about that,'" type questions. She would also ask repetitive questions in differing ways to determine if a child had been coached on what to say.

She interviewed the victim in this case, which interview was video recorded, and the recording was given to law enforcement officers. During the interview, the victim disclosed that "Joe-Joe touched her and licked her on her butterfly, which is her term for . . . female vagina." Using an anatomical drawing, Ms. Stith asked the victim if the defendant's finger "ever went inside that little slit" on her body, and the victim responded affirmatively. The victim pointed to the vagina on the anatomical drawing to show where the defendant had licked her.

Ms. Stith explained that it was "not very uncommon" for a child victim of sexual assault to engage in "sexually reactive behavior," stating that this behavior was "more the norm than the exception." Ms. Stith stated, however, that it was not her

-4-

practice to try to assess whether a child victim had "perped on another child." Ms. Stith said that it was common for a child to have difficulty remembering details of what happened to them or to wait several years before disclosing the abuse. Ms. Stith further explained that it was common for a child to minimize the abuse, leaving out details because their "minds do not work as our minds do. They don't store all of those details. They're learning so much about the world and things around them that they do not store every detail. But they also . . . can give me some detail usually." As an illustration, Ms. Stith described a line of questioning from the victim's interview:

> She said, "My pants were not off," and I asked her what she meant by that. And she said, "They were only halfway down." So that's a detail, but it's also -- we would have meant if we had been interviewed as adults, we would have said, "He only pulled my pants halfway down," but until she was able to be led to "Where were your pants?" she didn't recall that it was just halfway down. And I thought they weren't pulled down until she said that.

During cross-examination, Ms. Stith explained that when a child has suffered sexual abuse, "[t]here's usually a change of behavior or a change in personality sometimes that leads a person to suspect" the abuse. Ms. Stith was unaware of any such changes in the victim, but she noted that she had met the victim only twice. Ms. Stith acknowledged that children sometimes lie in their interviews, including approximately 10 percent of the children that she interviews. She also acknowledged that children can be manipulative but that that was "not the norm." Ms. Stith stated that she interviewed the victim in December 2016 and that the victim reported that the incident with the defendant had occurred three years prior in the summer. Ms. Stith stated that she found the victim to be "a little" immature for her age.

Andrew Akers, an inmate at the Grainger County Sheriff's Department, testified that, in the Spring of 2017, he had a conversation with the defendant about this case. He stated that the defendant "didn't really give specifics on the case" but that "[i]t was about his niece." According to Mr. Akers, the defendant admitted to him "that he did that" but did not otherwise provide specifics. Mr. Akers said that the defendant had mentioned seeking a mental health defense, saying that he was going to call "Helen Ross McNabb to say that he was not mentally capable of knowing right from wrong." In a conversation closer to the trial, the defendant told Mr. Akers that he "took the [victim's] pants down and her panties and rubbed her private area while he was masturbating." When Mr. Akers learned this information, he contacted an investigator at the district attorney's office in Sevierville with whom he had previously cooperated in an unrelated

case. Mr. Akers stated that he was impacted by cases involving child victims because "[b]ack in 2011, my mom shot my son and killed herself."

Mr. Akers explained that, at the time of the defendant's trial, he was incarcerated in relation to a violation of the sentence of probation imposed for his misdemeanor theft conviction. He acknowledged that, in exchange for his testimony in this case, he "was told [he] would be getting released on May 10th to unsupervised probation." He claimed that, when the defendant learned that the State intended to call Mr. Akers as a witness, the defendant asked him "please not to testify against him." Mr. Akers stated that the defendant also threatened him, saying that "he was from Detroit and he had outlaws and Hells Angels that was his family that he would if he . . . got convicted of this crime, that he would have me shot with a shotgun, was his exact words." Mr. Akers acknowledged that he had a lengthy criminal history and that he had previously acted as a paid informant in other cases; however, he denied being an informant in this case and stated that he did not receive payment for his testimony.

During cross-examination, Mr. Akers acknowledged that he had been convicted of three felonies and that, as a police informant, he had been paid to make drug purchases at the rate of $100 per purchase. Mr. Akers acknowledged that he expected to be released on probation in exchange for his testimony in this case, which probation would run until 2028. Mr. Akers maintained that the defendant talked to him about this case and that he made a written statement in relation to this case in May 2017, at which time he was serving a sentence for a violation of probation in Sevier County.

Detective Josh Pettiecord of the Grainger County Sheriff's Department interviewed the defendant after the defendant signed a written waiver of rights form. During the interview, the defendant stated that he lived on Roach Road in Grainger County and admitted that he had been at the house while children were present over the summer.

During cross-examination, Detective Pettiecord acknowledged that the defendant did not admit to abusing the victim. He also acknowledged that there was no physical evidence in this case. In his investigation, Detective Pettiecord "talked to initially the victim's mother. . . . and then had her come down here to Tennessee. Then, of course, set up the forensic examinations. Did that with [the victim]. And then, of course, later on, we ended up picking [the defendant] up and interviewing him." Detective Pettiecord spoke with J.W. at the forensic interview but did not speak with any other members of the defendant's family. Detective Pettiecord stated that no search of the defendant's residence, cellular telephone, or computer was conducted, explaining that he ordinarily would not search a defendant's cellular telephone when three years had

passed since the alleged incident because "the majority of the time the information is already deleted or gone or phones have changed hands."

The State rested, and the defendant elected to put on proof.

V.W., the defendant's sister, testified that she and R.B. had resided at 1587 Roach Road for five years. They moved into the house in "January or February of 2013," and her "Uncle Timmy" lived with them until May of that year. The defendant moved in with them "around the winter time of 2013" and lived with her until his trial. She first stated that J.W. and his family "would visit, but they wouldn't visit my house. They would visit at our parents' house during holidays, family functions, and different sort of things like that." She then clarified that the victim's mother and J.W. never stayed overnight at her house and would come over only "to pick up their kids." She said the victim had stayed overnight at her house but that J.W.'s children stayed with her more often than the victim did. V.W. recalled that, shortly after her Uncle Timmy moved out of her house, the victim and J.W.'s children stayed with her before the defendant moved in. She said that that was the first time that the victim had stayed at her house and that the defendant did not live with her at that time.

V.W. testified that the bedroom she shared with R.B. lay off of the living room in the front of the house, a second bedroom lay off of the kitchen in the middle of the house, and the defendant's bedroom was in the back of the house. When the children visited, they would sleep on a pullout couch in the living room. V.W. stated that, in 2013, the children stayed with her for up to a week at a time and reiterated that the defendant did not live with her when the children visited in 2013. During the visits that took place after the defendant moved in, the victim "slept in the bed with [V.W.], and [R.B.] slept on the couch in the living room." V.W. stated that the victim never complained to her about the defendant or reported anything inappropriate to her. She also said that when the victim was at the house, she and R.B. were always home, explaining, "If I was to go anywhere in my house, if [the victim] was there with me [the victim] was with me. I did not leave [the victim] with my husband. I did not leave [the victim] with anybody other than me."

V.W. stated that she was "a very light sleeper" and that she "[m]ore than likely . . . would hear" if anyone moved around the house at night. She added that her "youngest dog was not socialized so any kind of new movement in the house, whether it be human or animal, my dog would bark. She would go crazy. So therefore, there was no movement in my house without me knowing about it."

During cross-examination, V.W. testified that the children "visited all the

time" before the allegations in this case came to light. She acknowledged that the children were at her house many times when the defendant was there, but she maintained that the defendant did not move in with her until late 2013. She said that the victim's allegations against the defendant had fractured her family and that she and her parents did not see any of the children anymore.

R.B. testified that the defendant moved in with him and V.W. approximately one year after they had moved into the house on Roach Road. The victim and her siblings would visit their house "[t]hrough the holidays or anytime that they had out of school" a "few times a year." Their parents did not stay with them. R.B. stated that "the couple of times that [the victim] had stayed with us, she was with my wife in our bed. The boys would be in the spare room or in our middle bedroom. . . . And I would be sleeping on the couch or something like that." He also said that when the children were visiting, he and V.W. or other adults were always around. R.B. stated that "if anybody is moving around" during the night, "our dogs would get up and bark and make some kind of noise" and that, when the children were visiting, he would "get up and make sure everything [wa]s okay and make sure nothing [wa]s going on." He reiterated that the defendant was never alone with the victim at his house.

On cross-examination, R.B. maintained that he and V.W. moved into their house in January or February of 2013. He said that he and V.W. loved having the children visit, stating that "it was all joy and fun." R.B. could not recall a time when the defendant was at the house when the children spent the night; he noted that the defendant stayed at his parents' house on those nights. He acknowledged that he and V.W. had cared for the defendant for a long time and that the victim's allegations had torn the family apart. R.B. stated that the victim's story "seem[ed] a little far-fetched and a little stretched. Do I think anything happened? No." He acknowledged that he was only assuming that nothing had happened, but he said that if he had known that the defendant had committed the offenses, he would have called the police.

The defendant's mother, T.W., testified that J.W. and his family would visit them frequently and stay at their house; the children would sometimes stay at V.W.'s house. She stated that the children visited every summer but that the victim "never talked to me." T.W. said that the defendant and J.W. had not gotten along since "early childhood" but that she did not know the source of their contention. She explained that J.W. was the one who did not get along with the defendant and that the defendant "always ignored [him] to avoid conflicts." She said that the victim was not present for many family gatherings after J.W. married the victim's mother because "in the beginning, her children were not at my house, just my grandsons. And then maybe a year later is when she brought her daughter and son around."

On cross-examination, T.W. testified that she did not consider the victim to be her grandchild but insisted that she treated her as such. The victim did not have a name for T.W. because "[s]he said that I was not blood related so she can't call me Grandma so -- so she didn't like my birth-given name, so she didn't know what to call me." T.W. stated that she loved all of her children, but she was disappointed in J.W. because she "would have never thought my son would bring it to this level." T.W. explained that she believed that the victim's mother had put the victim up to making the allegations against the defendant.

During redirect examination, T.W. said she and her family had moved to Tennessee from Michigan.

After a *Momon* colloquy, the defendant elected to testify.

The defendant denied having raped or molested the victim. He stated that, before his arrest, he had lived with V.W. on Roach Road from November or December of 2013 until 2016. He was not employed but drew disability income. During the time that he lived with V.W. and R.B, his nephews would visit "approximately every summer sometimes whenever I'm there" and that the victim visited "approximately twice." He acknowledged that the children would spend the night at the house. He said that his nephews loved him "to death" and "wante[ed] . . . me to play with them nonstop" while the victim "never come around that much. She just says 'Hi' and then walks away." The defendant stated that he saw the victim on October 30, 2016, at V.W.'s house and that he had seen her a "couple of times on holidays." He said that he was never alone with the victim.

The defendant testified that he and J.W. had a long-standing conflict and that the defendant "just stay[ed] away from him because I'm the kind of person that don't want to get into a fight unless I have to. So every time when he tries to pick a fight with me, I just walk away." The defendant denied making the statements attributed to him by Mr. Akers. The defendant stated that he never admitted anything to Mr. Akers and did not threaten him; he told Mr. Akers only "that I moved down here from Detroit, Michigan."

During cross-examination, the defendant stated that the family treated the victim like part of the family. He maintained that he and J.W. had "basically disliked each other" since childhood. He acknowledged that he had spent the night in the same residence as the victim but said that the victim "was sleeping in my sister's room when I was staying there with her." He reiterated that he did not move into V.W.'s house until

late 2013, and the only summers that he was living there were 2014 to 2016.

The defendant acknowledged that he had been housed with Mr. Akers on the same cell block, and he acknowledged that he had told Mr. Akers that he "had twenty-eight charges that I don't know what they were or who they were against." He initially acknowledged that he told Mr. Akers that it was a possibility that his niece was the alleged victim but later denied telling Mr. Akers that his niece was the alleged victim, clarifying that Mr. Akers "heard me talking about it to other people." He acknowledged telling Mr. Akers about a letter that he had written to someone at the bar association. The defendant contended that Mr. Akers made up the defendant's seeking a mental health defense through Helen Ross McNabb, stating, "The only reason I went to Helen Ross McNabb is to see if they'll help me with adjusting my medicine." He acknowledged having undergone a mental health evaluation at Cherokee Health Systems, but he explained that the evaluation "was a requirement." When pressed, he acknowledged that the mental health evaluation was to determine his competency to stand trial and whether he knew right from wrong.

On this evidence, the jury found the defendant guilty of two counts of the lesser included offense of criminal attempt to commit rape of a child. After a sentencing hearing, the trial court imposed two 12-year sentences to be aligned consecutively to each other for a total effective sentence of 24 years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant argues that the evidence adduced at trial was insufficient to support his convictions, that the trial court erred by admitting certain evidence in violation of Rule 404(b), and that the sentence is excessive.

## I. Sufficiency of the Evidence

The defendant contends that the State failed to present sufficient evidence to support his convictions for attempted rape of a child. We disagree.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (superseded on other grounds); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the

-10-

evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Here, the defendant does not argue that the State failed to prove any element of the offense; rather, he challenges only the credibility of the State's evidence. This court is not free to reweigh the evidence presented at trial nor override the jury's credibility determinations. *See Dorantes*, 331 S.W.3d at 379. By its verdict, the jury accredited the State's evidence and resolved any issues of credibility in favor of the State, as was their prerogative. *See Cabbage*, 571 S.W.2d at 835. Accordingly, we hold that the evidence sufficiently supports the convictions.

## *II. Rule 404(b)*

The defendant contends that the trial court admitted evidence of the defendant's pushing the victim and one of her stepbrothers into the bathroom and telling them to pull their pants down in violation of Evidence Rule 404(b). The State argues that the defendant has waived this issue by failing to supply an adequate record for review.

The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

The record before us indicates that the trial court ruled on the admissibility of the statement in question sometime before the trial.[4] During the trial, the defendant objected to the State's playing a portion of the victim's video-recorded forensic interview, stating that his grounds for objection were the same as what he "initially brought." The State asserted that the portion of the video in question was the victim's "talking about the bathroom incident," which, the State argued, was consistent with the

---

[4]     At trial, during the playing of the victim's video-recorded forensic interview, the trial court instructed the jury: "[T]here are issues that the Court has already made determinations on outside the presence of the jury, and there may be a place or two in this that we will move forward. Don't concern yourself with what we moved forward over. The important and relevant parts for you to consider are what we're going to play for you."

court's prior ruling. The record before us is devoid of any transcript or order related to the admissibility of the victim's statement. Furthermore, the record fails to indicate what portions of the video recording were played for the jury. Accordingly, the record is inadequate to facilitate our review, and we must presume that the ruling of the trial court was correct.

*III. Sentencing*

Finally, the defendant argues that his effective 24-year sentence is excessive. The State argues that the trial court did not err in imposing the sentence.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

In the instant case, the record reflects that the trial court, in sentencing the defendant, considered all appropriate principles set forth in Code section 40-35-210(b). The court found no mitigating factors and two enhancement factors to be applicable: that the "offense involved [a] victim and was committed to gratify the defendant's desire for pleasure or excitement," *see* T.C.A. § 40-35-114(7), and that the defendant "abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense," *see id.* § 40-35-114(14). Based on these findings, the

trial court imposed a within-range sentence of 12 years for each conviction. *See* T.C.A. § 39-13-522(b)(1) (identifying rape of a child as a Class A felony); *id.* § 39-12-107(a) (classifying criminal attempt as "an offense one (1) classification lower than the most serious crime attempted"); *id.* § 40-35-112(a)(2) (assigning a Range I sentence of "not less than eight (8) nor more than 12 (12) years" for a Class B felony conviction). Because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of these within-range sentences.

With regard to sentence alignment, the trial court based its imposition of consecutive sentencing on the finding of aggravating circumstances "arising from the relationship between the defendant and the victim," "the time span of defendant's undetected sexual activity," and "the scope of the sexual acts and the extent of the residual physical and . . . mental damage to the victim." *See* T.C.A. § 40-35-115(b)(5). The record supports the trial court's findings. The defendant was the victim's step-uncle, and the defendant committed the offenses while the victim's sibling slept nearby. Ms. Stith's testimony was sufficient to support a finding that the victim's sexual activity toward her stepbrother was "sexually reactive behavior" attributable to the abuse. Thus, the trial court's decision to impose consecutive sentencing was not improper.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE